# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MICHAEL VAHEY,

     Plaintiff,

     v.

GENERAL MOTORS COMPANY,

     Defendant.

Civil Action No. 11-661 (JDB)

## MEMORANDUM OPINION

Plaintiff Michael Vahey, a former employee of General Motors ("GM")[1] and an honorably discharged veteran, brings this action against defendant GM alleging a violation of his rights under the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"). Specifically, Vahey alleges (1) a failure to properly reemploy him after returning from his military service, (2) unlawful discharge, and (3) discrimination based on his military absence. GM has moved for summary judgment on all three of Vahey's claims pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 7(h). Upon consideration of GM's motion, the parties' memoranda, and the entire record herein, the Court will deny the motion for summary judgment.

### I.    Background

Vahey worked for GM from 1997 to 2005. Deposition of Michael Vahey ("Vahey Dep."), Ex. A to Def.'s Mot. for Summ. J. ("MSJ") [Docket Entry 22-1] at 24, 67; Compl.

---

[1] According to the defendant, "General Motors LLC is improperly named in Plaintiff's Complaint as 'General Motors Company.'" Def.'s Reply in Supp. of Mot. to Dismiss [Docket Entry 5] at 1 n.1. The Court will refer to the defendant as "GM" in this opinion.

[Docket Entry 1] ¶¶ 10, 16.  He started as a contract employee in 1997 at an assembly plant in Baltimore, Maryland, Vahey Dep. at 24, and was first hired as a salaried employee in March 1998, id. at 26.  Vahey earned a series of promotions while he worked at the Baltimore plant.  Id. at 28-29; Declaration of Michael J. Vahey ("Vahey Decl."), Ex. A to Pl.'s Opp'n to MSJ [Docket Entry 24-1] ¶ 1; Compl. ¶ 12.  He also received expanded job responsibilities.  See Vahey Dep. at 32-34.

Vahey applied for and received a lateral transfer to the position of Resident Quality Launch Engineer in August 2004.  Id. at 34; Compl. ¶ 15.  As a "Resident" Quality Launch Engineer, Vahey was not assigned to the headcount of any particular GM facility, but instead was a General Motors "North America" employee, meaning he would be temporarily assigned (typically for one or two-year periods) to assist with the launch of new products.  See Vahey Decl. ¶¶ 17, 22.  In 2004, GM assigned Vahey to assist with the launch of the Pontiac Solstice at the GM assembly plant in Wilmington, Delaware.  Vahey Dep. at 35; Vahey Decl. ¶ 17.  During his time at GM, Vahey's supervisors consistently gave him high performance ratings, at one point rating him a "high potential" employee.  Vahey Dep. at 35-40; Vahey Decl. ¶ 6; Compl. ¶ 12.

Vahey had been interested in military service since the terrorist attacks of September 11, 2001, but had been reluctant to enlist due to fears that doing so might negatively impact his civilian career with GM.  Vahey Dep. at 65; Vahey Decl. ¶ 8; Compl. ¶ 16.  Eventually, Vahey learned about the reemployment protections given to returning servicemembers under USERRA. Vahey Dep. at 59-60; Vahey Decl. ¶ 8; Compl. ¶ 16.  Under USERRA, individuals who leave a civilian job to perform five or fewer years of military service generally have the right to be reemployed by their civilian employer upon honorable discharge from the military, and may not

be terminated without cause for up to one year after their return to work.  <u>See generally</u> 38 U.S.C. §§ 4311-4316.

In early 2005, Vahey approached his supervisors at GM as well as multiple human resources employees to discuss his desire to take a military leave of absence.  Vahey Dep. at 54-55; Vahey Decl. ¶ 9; Compl. ¶ 16.  The GM employees Vahey spoke with were supportive of his decision and granted Vahey a military leave of absence, with the understanding that he would return to GM in four years.  Vahey Dep. at 57-58; Vahey Decl. ¶ 9; Compl. ¶¶ 17-18.  After waiting for and receiving formal approval from GM, Vahey enlisted in the United States Army on July 20, 2005.  Vahey Dep. at 67-68.

Vahey spent four years on active duty with the Army, including sixteen months deployed overseas.  <u>Id.</u> at 80.  During those four years he made occasional contact with GM's human resources staff to express his desire to return to his job at GM after his military service.  <u>See id.</u> at 75-78 ("I'm still alive and it's still my intent to return to my career."); Vahey Decl. ¶¶ 11-12; Compl. ¶ 21.  As his military service came to an end, Vahey applied for reemployment with GM.  <u>See</u> Vahey Dep. 86-89; Compl. ¶ 23.

As early as April 23, 2009, the GM Human Resources team began discussing Vahey's return from active duty.  Ex. B to Pl.'s Opp'n to MSJ [Docket Entry 24-2] at D00306.  On May 4, 2009, Theresa Fellows-Bechard emailed her human resources colleague Paul Dobos, asking for "the date of Mike Vahay's [sic] return from leave," calling this "a critical piece of information as we try to plan for the GMSP."  <u>Id.</u> at D00301.  "GMSP" stands for "General Motors Severance Program."  <u>See</u> Ex. F to Pl.'s Opp'n to MSJ [Docket Entry 24-6] at D00040.

Vahey visited the GM plant in Wilmington, Delaware on May 5, 2009, with two months of active duty remaining.  Vahey Dep. at 87-88; Vahey Decl. ¶ 13.  He met with Paul Dobos,

with whom he discussed the impending closure of the GM plant in Wilmington and the significant financial troubles that were then facing GM and the American automotive industry. Vahey Dep. at 87-94; see also First Affidavit of Jeffrey Haladik, Ex. C to MSJ ("First Haladik Aff.") [Docket Entry 22-3] ¶ 4. Eventually, Dobos "said something about a separation package" and suggested that Vahey "would be getting severed." Vahey Dep. at 89; see also Vahey Decl. ¶ 13 ("Mr. Dobos stated to me that General Motors' outlook was not positive and that I would likely be severed."). Vahey "felt that as a North America employee that the closure of the Wilmington plant should not necessarily affect" him, so he raised the possibility of "other opportunities" at other GM facilities. Vahey Dep. at 89-91. According to Vahey, Dobos said "[s]omething to the effect that that wasn't going to happen." Id. at 91.

After Vahey's visit to the plant, internal discussions continued regarding Vahey's desire to return to work at GM. On June 10, 2009, Paul Dobos emailed Theresa Fellows-Blanchard: "Wilmington will have a small GMSP 8/1/09. Let me know if [Vahey] will be included in that one pending what legal and policy tell you." Ex. B to Pl.'s Opp'n to MSJ at D00309. On June 17, 2009, Dobos confirmed that "Mike [Vahey] will be on Wilmington GMSP list." Id.

Vahey was honorably discharged from the United States Army on July 20, 2009, and he visited Paul Dobos at the GM Wilmington plant a few days later, on July 23, 2009. Vahey Dep. at 99-101; Vahey Decl. ¶ 15. Dobos explained that Vahey was going to be formally added to the employment rolls for two weeks, retroactive to his final day of military service, July 20, 2009, and then he would be terminated on July 31, 2009. Vahey Dep. at 98; Vahey Decl. ¶ 15. After that, Vahey would receive six months of severance pay (about $39,000), in exchange for signing the "GM Severance Program Release Agreement." Vahey Dep. 114-16; Vahey Decl. ¶ 15; Compl. ¶ 31. Although Vahey was formally on the GM payroll for two weeks, Vahey Decl.

¶ 19, there is no indication from the record that he actually performed any job-related duties, nor was there any discussion of his employment being extended after July 31, 2009, see id.

The GM Wilmington plant "ceased production operations" on July 28, 2009, leading to the elimination of over 1,000 jobs, First Haladik Aff. ¶ 5, approximately 114 of which had belonged to salaried employees like Vahey, see Ex. D to Pl.'s Opp'n to MSJ [Docket Entry 24-4].[2] Vahey was among the first six salaried employees terminated in connection with the closing of the plant. See Ex. D to Pl.'s Opp'n to MSJ at D00399. Most GM Wilmington employees were severed in the months after Vahey's termination, but some received transfers to other GM facilities. See Ex. E, Def.'s Second Supp. Interrog. Resps. [Docket Entry 24-5] at 5 (listing "salaried employees who transferred from the Wilmington plant to another GM facility in connection with the closure of the Wilmington plant"); see also Def.'s Answer [Docket Entry 8] ¶ 32 ("[N]ot all employees who were working at the Wilmington, Delaware plant were terminated."). Vahey was never presented with the opportunity to apply for a transfer. Vahey Dep. at 92-95, Vahey Decl. ¶¶ 20-21. He claims this opportunity was given to the other salaried employees at the Wilmington plant. Vahey Decl. ¶ 20; see also Declaration of Jeffrey W. Watt, Ex. C to Pl.'s Opp'n to MSJ ("Watt Decl.") [Docket Entry 24-3] ¶ 2 ("In early June, 2009, manager [sic] at the Wilmington plant called me and the other salaried employees into meetings in which we were offered two options, either apply for a transfer or accept separation and severance.").

---

[2] Both parties appear to assume that the relevant comparators are Vahey's fellow salaried employees, rather than every worker affected by the closure of the Wilmington plant. The Court adopts the same assumption.

Vahey filed this lawsuit alleging violations of his USERRA rights on April 1, 2011. GM moved to dismiss, relying solely on the release[3] that Vahey signed upon receiving his severance package. The Court denied the motion to dismiss,[4] and GM moved for summary judgment at the close of discovery.

## II.     Standard of Review

### A.  Summary Judgment

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party may successfully support its motion by identifying those portions of "the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," which it believes demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c)(1); see also Celotex, 477 U.S. at 323.

---

[3] The release specified that by accepting the severance package, Vahey would "release and forever discharge GM . . . from all claims, grievances, lawsuits, demands, and causes of action, known or unknown, which [he] may have relating to [his] employment or [his] separation from GM." Ex. A to Def.'s Mot. to Dismiss [Docket Entry 3] at 2. The release did not specifically refer to USERRA claims or to claims based on veteran status, but did mention other specific statutes.

[4] The Court denied GM's Motion to Dismiss based on this release on March 1, 2012. See Mar. 1, 2012 Mem. Op. & Order [Docket Entry 6] at 11 ("For § 4302(b) of USERRA to be meaningful in its protections of veterans' rights, a veteran's waiver of his rights must be clearer and more specific than in this Release."); see also 38 U.S.C. § 4302(b) (USERRA "supersedes any State law (including any local law or ordinance), contract, agreement, policy, plan, practice, or other matter that reduces, limits, or eliminates in any manner any right or benefit provided by" USERRA). GM does not move for summary judgment based on the release, but does note that "[s]hould any issues remain for trial, GM intends to argue that plaintiff's claims in this lawsuit are barred by the" release. MSJ at 5 n.3.

In determining whether there is a genuine dispute of material fact sufficient to preclude summary judgment, the Court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. Id. at 252. Moreover, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (citations omitted). Summary judgment, then, is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.

## B. USERRA

Enacted in 1994, "USERRA is the latest in a series of laws protecting veterans' employment and reemployment rights." 20 C.F.R. § 1002.2. Many courts have noted that USERRA's protections "should be broadly construed in favor of military service members as its purpose is to protect such members." Vega-Colón v. Wyeth Pharms., 625 F.3d 22, 26 (1st Cir. 2010); see also Fishgold v. Sullivan Drydock & Repair Corp., 328 U.S. 275, 285 (1946) (Selective Training and Service Act of 1940, one of USERRA's predecessors, "is to be liberally construed for the benefit of those who left private life to serve their country in its hour of great need"). "In enacting the statute, Congress made clear that, to the extent consistent with USERRA, 'the large body of case law that had developed' under previously enacted federal laws protecting veterans' employment and reemployment rights 'remained in full force and effect.'" Rivera-Meléndez v. Pfizer Pharms., LLC, No. 12-1023, 2013 WL 5290017, at *3 (1st Cir. Sept. 20, 2013) (quoting 20 C.F.R. § 1002.2). "The purpose of USERRA is to (1) encourage noncareer military service by 'eliminating or minimizing the disadvantages to civilian careers,'

(2) minimize the disruption of servicemembers and their employers 'by providing for the prompt reemployment' of servicemembers, and (3) prohibit discrimination against servicemembers." Id. (quoting 38 U.S.C. § 4301(a)).

For servicemembers who spend more than ninety days in the military, Section 4313(a)(2) of USERRA requires reemployment "in the position of employment in which [the servicemember] would have been employed if the continuous employment of such person with the employer had not been interrupted" by military service. 38 U.S.C. § 4313(a)(2)(A). This position—known as the "escalator position"—does not necessarily require a promotion, or even reinstatement to the employee's prior position: "the escalator principle may cause an employee to be reemployed in a higher or lower position, laid off, or even terminated." 20 C.F.R. § 1002.194. "In some cases, for example, the escalator principle could deliver an employee into 'layoff status' if the 'employee's seniority or job classification would have resulted in the employee being laid off during the period of service, and the layoff continued after the date of reemployment.'" Rivera-Meléndez, 2013 WL 5290017, at *4 (quoting 20 C.F.R. § 1002.194). USERRA also provides that reemployment is not required if "the employer's circumstances have so changed as to make such reemployment impossible or unreasonable." 38 U.S.C. § 4312(d)(1)(A). When invoking this defense, the employer "shall have the burden of proving the impossibility or unreasonableness" of reemployment. Id. § 4312(d)(2).

Once properly reemployed, returning servicemembers who spent more than 180 days in the military "shall not be discharged . . . except for cause," within the first year of their reemployment. Id. § 4316(c). Although USERRA does not define "cause," Department of Labor regulations explain that "cause" may be "based either on [the employee's] conduct or, in some circumstances, because of the application of other legitimate nondiscriminatory reasons,"

such as a layoff or reduction in force.  20 C.F.R. § 1002.248.  In such a case, "[t]he employer bears the burden of proving that the employee's job would have been eliminated or that he or she would have been laid off."  Id.

Finally, USERRA contains a "catch-all" discrimination provision, providing that a returning servicemember "shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of" their military service.  38 U.S.C. § 4311(a).  "An employee who makes a discrimination claim under USERRA bears the initial burden of showing by a preponderance of the evidence that his 'membership . . . or obligation for service in the uniformed services' was a substantial or motivating factor in the adverse employment action."  Potts v. Howard Univ. Hosp., 843 F. Supp. 2d 101, 104 (D.D.C. 2012) (quoting 38 U.S.C. § 4311(c)), aff'd, 493 F. App'x 114 (D.C. Cir. 2013).  Once "the employee successfully makes that prima facie showing, the employer can avoid liability by demonstrating that it would have taken the same action anyway for a valid reason, without regard to the employee's military service."  Id.; accord Erickson v. U.S. Postal Serv., 571 F.3d 1364, 1368 (Fed. Cir. 2009).  An employer may still violate USERRA if military service is one of several "motivating factors" in the denial of "any benefit of employment," as opposed to the sole motivating factor.  Erickson, 571 F.3d at 1369 ("Congress enacted USERRA in part to make clear that discrimination in employment occurs when a person's military service is 'a motivating factor,' and not to require, as Monroe[ v. Standard Oil Co., 452 U.S. 549 (1981),] had suggested, that military service be the sole motivating factor for the adverse employment action."); see also H.R. Rep. 103-65, at 24 (1993) (explicitly disapproving of the Supreme Court's decision in Monroe).

### III. <u>Analysis</u>

Vahey brings three claims under USERRA. First, he claims that GM failed to properly reemploy him as required by 38 U.S.C. § 4312(a), arguing that he "was not reemployed in the position he would have held had he . . . not served in the uniform service," and that, indeed, he "was not reemployed in any position." Compl. ¶ 27. Next, Vahey alleges that his termination was an unlawful discharge in violation of 38 U.S.C. § 4316(c), which states that "[a] person who is reemployed by an employer under [USERRA] shall not be discharged from such employment, except for cause," within one year of reemployment. Compl. ¶ 41. Finally, Vahey alleges that GM discriminated against him on the basis of his military absence in violation of 38 U.S.C. § 4311(a), because GM "fail[ed] to provide Mr. Vahey the opportunity to transfer to another facility and retain employment with the Defendant, although this opportunity was provided to non-USERRA protected employees." Compl. ¶ 44. Vahey argues that all three violations were "willful" within the meaning of 38 U.S.C. § 4323(d)(1)(C). Compl. ¶¶ 39, 42, 45.

### A. Count 1: Failure to Properly Reemploy – 38 U.S.C. § 4312(a)

Vahey's first claim is that GM failed to properly reemploy him as required by 38 U.S.C. § 4312(a). Because he spent more than ninety days in the uniformed services and he satisfied all the statutory prerequisites,[5] he was presumptively entitled to reemployment "in the position in which [he] would have been employed" had his career "not been interrupted" by military service. 38 U.S.C. § 4313(a)(2)(A). To decide whether GM satisfied this obligation, the Court must

---

[5] Such prerequisites include showing that the plaintiff was a member of the uniformed services, that his leave was taken due to his service in the uniformed services, that he was an employee, and that the defendant was his employer. <u>See</u> 38 U.S.C. §§ 4303(3), (16); <u>id.</u> § 4312(a); <u>accord</u> <u>Dunlap v. Grupo Antolin Ky., Inc.</u>, No. 5:05-cv-00029-R, 2007 WL 855335, at *2 (W.D. Ky. Mar. 14, 2007). The plaintiff must also provide the defendant with advance notice of his intent to take a military leave of absence and submit an application for reemployment. <u>See</u> 38 U.S.C. § 4312(a); <u>accord</u> <u>Dunlap</u>, 2007 WL 855335, at *2. There is no dispute that Vahey satisfied all of these requirements.

determine: (1) in what position, if any, was Vahey reemployed, and (2) whether that position is the one he would have occupied had he not taken military leave. Even if Vahey can show that GM did not properly reemploy him, GM can escape liability if it can prove that due to changed circumstances, doing so would have been "impossible or unreasonable." Id. § 4312(d)(1)(A).

### 1. In what position was Vahey reemployed?

GM claims that "it reinstated plaintiff to the same position and seniority date he held prior to his leave, and adjusted his pay rate to account for any increases to which he may have been entitled during his leave period." MSJ at 7; see also Def.'s Statement of Undisputed Facts ("Def.'s SOF") ¶¶ 5-7. Vahey disagrees, claiming that he "was not actually reemployed into any position," and that he "was simply put back on the rolls for the purpose of being terminated." Pl.'s Opp'n to MSJ at 36. On Vahey's view, "[p]lacement into a position without any duties, and with a clear intent simply to terminate the employee is nothing more than a pro forma reinstatement that does not comply with USERRA . . . ." Id.

In other words, the parties agree that Vahey was formally reinstated to the position of Quality Launch Engineer, and that he was officially placed on "paid status" for the two weeks between July 20, 2009 and August 1, 2009. But the parties disagree about what this means. GM considers it a full and proper reemployment; Vahey considers it a "pro forma" fig leaf that masks his true reemployment position: layoff status. Unfortunately, the parties' briefing focuses little attention on this point, and neither the parties nor the Court have identified any cases analyzing this precise issue. Noting that USERRA "must be broadly construed in favor of its military beneficiaries," Francis v. Booz, Allen & Hamilton, Inc., 452 F.3d 299, 303 (4th Cir. 2006), the Court decides that Vahey has the better of this argument.

The two-week period between July 20, 2009 and August 1, 2009 that Vahey spent on the GM payroll bears little resemblance to the ordinary understanding of what it means to be "employed." First, Vahey's formal reinstatement was not finalized until July 23, 2009, see Vahey Decl. ¶ 15; the first three days of his so-called "reemployment" were a retroactive fiction. Second, during the two weeks, the record suggests that Vahey was not expected to—nor did he in fact—perform any job-related duties. It appears that the only time Vahey was even on the premises at the GM Wilmington plant during this period of "employment" was on July 23, 2009, when he came in to sign his severance paperwork. See id. ¶¶ 15-19. Third, there was never any doubt that on August 1, 2009, Vahey was going to be officially terminated. In fact, that decision had been made no later than June 17, 2009—while Vahey was still on active duty with the Army—when Paul Dobos confirmed in an email that "Mike [Vahey] will be on Wilmington GMSP list." Ex. B to Pl.'s Opp'n to MSJ at D00309. Nothing in the record suggests that there was ever a possibility of continued employment beyond that date.

The Court need not allow form to prevail over substance. See EEOC v. Sears, Roebuck & Co., 839 F.2d 302, 346 (7th Cir. 1988) ("[C]ourts have invariably gone beyond job descriptions to analyze, often in-depth, actual job duties and job performance."). This is particularly true in USERRA cases, in which Congress has "authorize[d] a district court to use its 'full equity powers . . . to vindicate fully the rights of' veterans." Serricchio v. Wachovia Secs. LLC, 658 F.3d 169, 174 (2d Cir. 2011) (emphasis omitted) (quoting 38 U.S.C. § 4323(e)); see also Bride v. Baker, 37 App. D.C. 231, 236 (D.C. Cir. 1911) ("Equity looks to substance, and not to form, and will not lend its aid to one whose sole ground for seeking such aid is based upon a technicality."). GM insists that Vahey was reemployed for two weeks with no job duties, and upon his formal termination on August 1, 2009, he received six months' pay as a severance

package. But in light of the facts in the record, a more accurate description of Vahey's employment history is as follows: Vahey was effectively terminated <u>immediately</u> upon his return from his military absence, after which he received two weeks' pay, and a severance package equivalent to six months' pay.

To be sure, some courts have noted that Section 4312 requires only initial reemployment of a returning veteran, and that Section 4316 (unlawful discharge) and Section 4311 (discrimination) provide the only protections immediately thereafter. <u>See, e.g.</u>, <u>Petty v. Metro. Gov't of Nashville & Davidson Cnty.</u>, 687 F.3d 710, 718 (6th Cir. 2012) ("Once a veteran is rehired, §§ 4311 and 4316 protect him from discrimination, but allow an employer to terminate a veteran so long as it can show 'cause' unrelated to the veteran's military service."); <u>Francis</u>, 452 F.3d at 304 ("[Section] 4312 only entitles a service person to immediate reemployment and does not prevent the employer from terminating him the next day or even later the same day. The apparent harshness of this result is addressed by the fact that §§ 4311 and 4316 operate to protect the employee as soon as she is reemployed.") (internal citation and quotation marks omitted). Those cases, however, anticipate a situation where the veteran was <u>actually reemployed</u> in good faith, with at least the <u>possibility</u> of continued employment of indefinite length—not the pro forma, nominal reinstatement that took place here, in which all parties were aware that Vahey did not even need to show up to work, and that he would surely be officially terminated just two weeks later. <u>See, e.g.</u>, <u>Petty</u>, 687 F.3d at 718 (asking whether the defendant "<u>truly</u> reemployed" the plaintiff) (emphasis added). Thus, the Court concludes that for the purposes of USERRA, Vahey was "reemployed" into layoff status—not the Quality Launch Engineer position that appeared on his official paperwork.

### 2. Is layoff status the "position" Vahey would have occupied but for his military leave?

The Court's determination that Vahey was "reemployed" into layoff status does not mean that he prevails on his Section 4312 claim. "USERRA is not a veteran's preference statute," and "it was not intended to give returning servicemembers special benefits not provided to other employees." Milhauser v. Minco Prods., Inc., 855 F. Supp. 2d 885, 899 (D. Minn. 2012). In other words, "the escalator principle could deliver an employee into 'layoff status' if the 'employee's seniority or job classification would have resulted in the employee being laid off during the period of service, and the layoff continued after the date of reemployment.'" Rivera-Meléndez v. Pfizer Pharms., LLC, No. 12-1023, 2013 WL 5290017, at *4 (1st Cir. Sept. 20, 2013) (quoting 20 C.F.R. § 1002.194); see also Milhauser, 855 F. Supp. 2d at 898 ("[U]nder some circumstances, termination may be an appropriate 'position of employment' under USERRA."); 20 C.F.R. § 1002.194 ("[T]he escalator principle may cause an employee to be reemployed in a higher or lower position, laid off, or even terminated."). Thus, the Court must determine whether, drawing all reasonable inferences in favor of Vahey, there remains a genuine dispute of material fact regarding whether GM would have terminated him in the counterfactual scenario in which Vahey had not taken a four-year leave of absence to serve in the military. The Court concludes that such a factual dispute remains.

As an initial matter, GM argues that the inherent discretion in the transfer and termination decisions shields them from liability, because "the escalator principle is only intended to encompass promotions that are 'automatic' and 'based solely on employee seniority.'" MSJ at 8 (quoting Rivera-Meléndez v. Pfizer Pharms., Inc., No. 10-1012 (MEL), 2011 WL 5025930, at *8 (D.P.R. Oct. 21, 2011); rev'd No. 12-1023, 2013 WL 5290017 (1st Cir. Sept. 20, 2013)). Vahey disagrees, arguing that the escalator principle "protects those changes and benefits which are

reasonably certain to accrue," and that "it is intended to encompass changes such as transfers." Pl.'s Opp'n to MSJ at 34.

Vahey is correct. He was entitled to any "reasonably certain" employment benefits that would have accrued during his military absence, including promotions and transfers. The fact that discretion was involved in such decisions—while surely making the fact-finder's job more difficult—does not decide the matter in favor of GM. In support of its "discretion" argument, GM relies almost exclusively on one case, <u>Rivera-Meléndez v. Pfizer Pharmaceuticals, Inc.</u>, No. 10-1012, 2011 WL 5025930 (D.P.R. Oct. 21, 2011). But that decision was recently reversed in a persuasive opinion by the First Circuit, at the urging of the Department of Labor as <u>amicus curiae</u>. <u>See</u> <u>Rivera-Meléndez</u>, 2013 WL 5290017, at *6. The First Circuit held that "the appropriate inquiry in determining the proper reemployment position for a returning servicemember is not whether an advancement or promotion was automatic, but rather whether it was reasonably certain that the returning servicemember would have attained the higher position but for his absence due to military service." <u>Id.</u> In doing so, the First Circuit showed "substantial deference" to the Department of Labor's interpretation of its own regulations, according to which "general principles regarding the application of the escalator position . . . require that a service member receive a missed promotion upon reemployment if there is a reasonable certainty that the promotion would have been granted." <u>Id.</u> (citing <u>Auer v. Robbins</u>, 519 U.S. 452, 461 (1997)); <u>see also</u> 20 C.F.R. § 1002.191 ("The escalator principle requires that the employee be reemployed in a position that reflects with reasonable certainty the pay, benefits, seniority, and other job perquisites, that he or she would have attained if not for the period of service."). Thus, the fact that GM exercised discretion in its termination and transfer decisions does not end the inquiry; the Court must determine whether there is a genuine factual

dispute regarding whether GM would have terminated Vahey but for his military leave. It is to this task the Court now turns. In doing so, the Court notes that the discretionary nature of the decision actually weighs <u>against</u> summary judgment, because it makes it more difficult to resolve the factual dispute at the heart of this case.

When the Wilmington plant closed, GM terminated most, but not all, of the salaried employees who worked there. <u>See</u> Def.'s Answer ¶ 32 ("[N]ot all employees who were working at the Wilmington, Delaware plant were terminated."). Some received transfers to other GM facilities. Others, including Vahey, did not. Unfortunately for GM, based on this lean summary judgment record, it is impossible for the Court to determine whether Vahey would have been laid off had he not taken a four-year military leave of absence. A reasonable jury could come up with more than one explanation for why GM selected Vahey for termination, rather than a transfer.

As an initial matter, the Court notes that the parties spend much of their briefing debating whether other GM employees who were transferred (rather than terminated) are sufficiently comparable to Vahey. <u>See generally</u> MSJ at 12-13; Pl.'s SOF ¶¶ 59-66; Def.'s Reply in Supp. of MSJ [Docket Entry 26] at 7-8. The goal of this effort was laudable: if GM treated Vahey differently than his similarly-situated colleagues, this could be circumstantial evidence of a USERRA violation. <u>See, e.g.</u>, <u>Tex. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 258-59 (1981) (discussing potential probative value in Title VII cases of evidence "that similarly situated employees were not treated equally"). But in this case, the Court cannot conclude (at least on summary judgment) that any of the proposed comparators are similarly-situated to Vahey "in all material respects." <u>Coleman v. Donahoe</u>, 667 F.3d 835, 846 (7th Cir. 2012); <u>see also</u> <u>Williams v. Chertoff</u>, 495 F. Supp. 2d. 17, 33 (D.D.C. 2007) ("In this Circuit, employees are similarly situated if all relevant aspects of their employment situations . . . are nearly identical.") (internal

quotation marks omitted). The employees in question have widely varying job descriptions and employment histories. <u>See generally</u> Ex. D to Pl.'s Opp'n to MSJ. And even if there were one or more similarly-situated comparators, it is not clear how useful such evidence would be to the fact-finder, due to the inherent discretion in GM's termination and transfer decisions. As one example of the complexities of such an analysis, a proper comparison of this sort might have to take into account the fact that Vahey's supervisors had previously designated him a "high potential" employee, <u>see</u> Vahey Decl. ¶ 6. But the record is silent on whether any of Vahey's colleagues had achieved that distinction. Similarly, Vahey's status as a "resident" employee— rather than one fixed to the Wilmington headcount—could be a confounding variable. <u>See</u> Ex. B to Pl.'s Opp'n to MSJ at D00306.

Because this case cannot be resolved based on an analysis of comparable co-workers—at least, not at the summary judgment stage—the Court must turn to the parties' competing narrative explanations as to why GM selected Vahey for termination, rather than a transfer. Vahey suggests that GM simply found him to be a more convenient candidate for termination due to his four-year military absence. <u>See</u> Pl.'s Opp'n at 23. GM offers an alternative explanation, claiming that "Michael Vahey was not offered a transfer to another facility when the Wilmington plant ceased production operations because there were no available positions based on his job classification, skills, and service date." First Haladik Aff. ¶ 7; <u>see also</u> <u>id.</u> ¶ 6 ("Employment decisions, including terminations and transfer offers, involving salaried employees affected by the cessation of production operations at the Wilmington plant were based on a combination of factors, including job classification, skills, and service date.").

As support for its theory, GM repeatedly references the "financial challenges" it was facing in the summer of 2009, including the fact that "[j]ust weeks before plaintiff's return, [GM]

had filed for Chapter 11 bankruptcy."  MSJ at 1.  To be sure, such hardship lends some credence to GM's claim that Vahey would have been laid off even if he had never left to serve in the military.  See Duarte v. Agilent Techs., Inc., 366 F. Supp. 2d 1039, 1047 (D. Colo. 2005) (finding it relevant to plaintiff's unlawful termination claim under USERRA that defendant was suffering "serious financial hardship").  But in light of the undisputed fact that some of Vahey's former co-workers at the Wilmington plant were not terminated, and instead were transferred to other facilities, the repeated references to the financial hardships facing GM simply beg the question: Did GM select Vahey for termination for purely financial reasons?  Or did his military absence affect their decision-making?

On this record, a reasonable jury could find Vahey's version of events more credible than GM's.  The only evidence in the summary judgment record that could possibly shine a light on GM's internal decision-making process with respect to Vahey suggests there was not much deliberation at all regarding Vahey's "job classification, skills, and service date" before GM decided to terminate him.  Just twelve days after Vahey confirmed to his superiors at GM that he intended to return to his civilian career, there was already email traffic suggesting Vahey would be laid off.  See Ex. B to Pl.'s Opp'n to MSJ at D00300 (May 5, 2009 email from Fellows-Bechard to Dobos saying "we would need to return [Vahey] to work with an increase and then GMSP him").  What is more, Vahey's "job classification, skills, and service date" are never discussed in the email exchanges amongst GM human resources employees that appear in the record, with the exception of two vague references to Vahey's status as a "Quality resident employee."[6]  Id. at D00306.  Standing alone, these "[c]onclusory statements" regarding GM's consideration of Vahey's qualifications "are insufficient to support summary judgment."  Santos v. DEA, 357 F. Supp. 2d 33, 37 (D.D.C. 2004).  Perhaps these factors were considered neutrally

---

[6] Vahey's full title was "Resident Quality Launch Engineer."  Compl. ¶ 15

and at length, but because there is no evidence in the summary judgment record to support such a conclusion, drawing such an inference in favor of GM—the moving party—would be inappropriate at this stage.

In contrast to the minimal evidence in the record that Vahey's qualifications and job skills were ever seriously considered by GM's human resources staff, internal emails are replete with references to Vahey's military leave of absence. This evidence tends to undermine GM's narrative, and a reasonable jury might rely on it to conclude that if it were not for his military absence, GM would not have terminated Vahey. The clearest example comes from a May 4, 2009 email from Human Resources Manager Theresa Fellows-Bechard to her colleague Paul Dobos, asking about Vahey's return from military leave. She asked: "Do you know the date of Mike Vahay's [sic] return from leave? It's a critical piece of information as we try to plan for the GMSP." Ex. B to Pl.'s Opp'n to MSJ at D00301. GM never acknowledges the potential significance of this email in its briefing, nor does it answer the question of why the date of Vahey's return from his military absence was relevant to their plans to conduct layoffs—let alone why it was a "critical piece of information." The guiding premise of USERRA is that military service should not disadvantage a returning servicemember in his civilian career. See 38 U.S.C. § 4301(a)(1) (stating that one of the purposes of USERRA is "to encourage noncareer service in the uniformed services by eliminating or minimizing the disadvantages to civilian careers and employment which can result from such service"). Although this evidence is ambiguous, a reasonable jury might find that calling the timing of Vahey's return from military service "critical" to upcoming layoff decisions suggests that Vahey was disadvantaged as a result of his service, and not simply another casualty of the financial troubles facing GM in 2009.

There are other examples in the record of GM's human resources staff discussing Vahey's military service in the context of upcoming layoffs. See, e.g., Ex. B to Pl.'s Opp'n to MSJ at D00315 ("He seems to know the federal law well that governs military leaves from a company."); id. at D00314 ("Mike [Vahey] will probably ask, was his pay adjusted to any scheduled increase from the time he went on military leave to his GMSP."); id. at D00309 ("It now looks like that Mike will be officially released from active duty July 20, 2009 not the earlier date he thought in June. I am going to fax a copy of his paperwork to you. It looks like Wilmington will have a small GMSP 8/1/09. Let me know if he will be included in that one pending what legal and policy tell you."); id. at D00306 ("He has been on military leave since 6/15/05. He said he is getting out of the Military this July. He shows in People Soft as being on Military from Department # 01141QM518. He was never on Wilmington headcount."); id. at D00302 ("Vahey called me today and said he is going to be released from the Army in mid June, earlier than expected. Is the plan the same as below? When I get his exact date I will send it to you. Have not heard if our plan below was given the OK by legal."); id. ("Yes the plan would be the same. I'm going to confirm everything (again) with policy and global comp. Let me know when you get the exact date."); id. at D00300 ("[H]is discharge date is July 20, 2009. . . . I have a son who is a Army Ranger, and a son-in-law in the Marines. Both just got back from Iraq a little while ago which makes Mike's situation hit close to home."). Once again, a reasonable jury might find these to be harmless, well-intentioned references to an unusual circumstance facing the human resources staff. On the other hand, a reasonable jury could also find that GM was unduly focused on Vahey's four-year military leave of absence, rather than his actual qualifications for a transfer. In the face of this factual uncertainty, the Court will not grant summary judgment in favor of GM.

In addition, GM's conclusory claim that "there were no available positions based on [Vahey's] job classification, skills, and service date" is difficult to accept at face value, particularly because the decision to terminate him was made no later than June 17, 2009, and possibly as early as May 5, 2009—which, according to Vahey, was before GM had offered its other salaried employees an opportunity to transfer, before GM would have known the applicant pool for the limited transfer opportunities, and thus, before GM would have known which positions were available.[7] A reasonable jury might choose not to credit GM's conclusory assertion that no positions were available in light of the timing of Vahey's termination.

Another point a reasonable jury might find persuasive is Vahey's argument that as a "Resident" Quality Launch Engineer and a General Motors "North America" employee—as opposed to an employee fixed to the official Wilmington "headcount"—he would have already been transferred to another facility to assist in the launch of a new product but for his military absence. Vahey Decl. ¶¶ 22, 26; see also Ex. B to Pl.'s Opp'n to MSJ at D00306 (GM human resources employee confirming that Vahey "was never on Wilmington headcount"). For similar reasons, a reasonable jury could find that Vahey was a particularly suitable candidate for a transfer upon his return, and that he should have been less likely to suffer the consequences of

---

[7] The record is clear that GM had already decided to terminate Vahey as of June 17, 2009, see Ex. B to Pl.'s Opp'n to MSJ at D00309, and one email suggests that the decision was made as early as May 5, 2009, see id. at D00300 (May 5, 2009 email from Fellows-Bechard to Dobos saying "we would need to return him to work with an increase and then GMSP him"). And at least one salaried employee was first offered an opportunity to apply for a transfer in "early June" 2009. See Watt Decl. ¶ 2. The parties dispute the remaining points: Vahey argues that all other salaried employees received a formal opportunity to apply for a transfer; GM denies it. As discussed in greater detail infra, Section III.C., the Court may not resolve this factual dispute in favor of GM at the summary judgment stage. Similarly, it is also no help to GM that the record is not clear regarding when other salaried employees applied for transfers, how many applications were submitted, how many positions were available, and when exactly GM would have known this information.

the closure of the Wilmington plant. GM offers no response, and summary judgment is inappropriate in the face of such unresolved factual ambiguities.

Even if it were clear that Vahey was going to be terminated, GM faces another problematic fact: Vahey was one of the first employees out the door at the GM Wilmington facility. On August 1, 2009, Vahey was terminated along with five of his co-workers. See Ex. D to Pl.'s Opp'n to MSJ at D00399. Thirty-four more employees were terminated on September 1, 2009. Id. at D00400. And the remaining seventy-four salaried employees at the GM Wilmington plant were either terminated or received their transfers on October 1, 2009. Id. at D00401-02. Although the record is not clear on this point, presumably those employees who were terminated in September and October received an additional one or two months' pay before receiving the same six-month severance package GM provided to Vahey. GM has offered no explanation as to why Vahey was included in the smallest, earliest wave of layoffs: in other words, why he was treated less favorably than over one hundred of his colleagues. To be sure, most of those colleagues would ultimately lose their jobs in the coming months, but an additional one or two months' salary is undoubtedly a "benefit of employment" protected by USERRA. See 38 U.S.C. § 4303(2) (defining "benefit of employment" broadly, including "wages or salary for work performed" and "severance pay"); see also id. § 4312(a) (returning veterans are entitled to all "employment benefits of this chapter"). Due to GM's failure to put forth any explanation for this disparate treatment, a reasonable jury might conclude that Vahey's military absence made him a more convenient candidate for early termination. Although a jury need not draw such an inference, the Court may not resolve this factual ambiguity in favor of the moving party at the summary judgment stage.

Based on the sparse summary judgment record before the Court, a reasonable jury could draw any number of conclusions with respect to what Vahey's employment status would have been had he not taken a four-year military leave of absence. Hence, at the summary judgment stage, Vahey has made out a prima facie case of a violation of USERRA's reemployment requirement.

###    3.    Had circumstances changed such that reemployment would have been impossible or unreasonable?

USERRA provides an affirmative defense to a reemployment claim if "the employer's circumstances have so changed as to make such reemployment impossible or unreasonable." 38 U.S.C. § 4312(d)(1)(A). The employer has the burden of "proving the impossibility or unreasonableness" of reemployment. Id. § 4312(d)(2).

At the outset, the Court notes that while GM raised this affirmative defense in its answer, see Def.'s Answer, Affirmative Defenses ¶ 8, its summary judgment brief includes only a conclusory one-sentence footnote devoted to it, see MSJ at 8 n.7. In light of GM's failure to develop the argument, the Court would be justified in refusing to address it. See, e.g., Schneider v. Kissinger, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work."); Hutchins v. District of Columbia, 188 F.3d 531, 539 n.3 (D.C. Cir. 1999) (en banc) ("We need not consider cursory arguments made only in a footnote."). However, because an analysis of the "changed circumstances" defense overlaps significantly with GM's other, better-developed arguments, the Court will consider the "changed circumstances" defense.

The case law varies with respect to the showing required to carry the employer's burden to prove that it would be "impossible or unreasonable" to reemploy a returning veteran. Some courts have asked for a significant showing, requiring "evidence of a fundamental underlying

shift in the business model and reality of a company's enterprise in order to avail itself of this defense." Davis v. Crothall Servs. Grp., Inc., No. 09-00312, 2013 WL 4417669, at *8 (W.D. Pa. Aug. 6, 2013). Several cases have explicitly held that layoffs and hiring freezes do not suffice. See, e.g., Cooper v. Hungry Buzzard Recovery, LLC, No. C11-0280-JCC, 2011 WL 5299422, at *3 (W.D. Wash. Nov. 4, 2011) ("In general, a decline in workload or business has not been considered sufficient to deny reemployment to returning veterans."); Dunlap v. Grupo Antolin Ky., Inc., No. 5:05-cv-00029-R, 2007 WL 855335, at *3 (W.D. Ky. Mar. 14, 2007) ("[T]he Court holds that, as a matter of law, mere low work load, layoffs, and a hiring freeze do not make reemployment impossible or unreasonable enough to invoke the exemption of 38 U.S.C § 4312(d)(1)(A)."); see also Davis, 2013 WL 4417669, at *8 ("Downsizing just to keep the doors open and claims of incapability of reemployment due to financial constraints without detailing how the employee would have exactly fit in such downsizing and reduced employment is insufficient for a changed-circumstance defense.").

Despite this language suggesting that layoffs are insufficient, Department of Labor regulations explicitly provide that by invoking the "changed circumstances" defense, "an employer may be excused from reemploying the employee where there has been an intervening reduction in force that would have included that employee." 20 C.F.R. § 1002.139(a); accord Milhauser v. Minco Prods., Inc., 855 F. Supp. 2d 885, 903 (D. Minn. 2012) ("[A] reduction in force that reasonably would have included the plaintiffs constitutes a circumstance making reemployment unreasonable."); Lapine v. Town of Wellesley, 167 F. Supp. 2d 132, 138 (D. Mass. 2001) (38 U.S.C § 4312(d)(1)(A) is a "very limited exception to be applied only where reinstatement would require creation of a useless job or where there has been a reduction in the

work force that would reasonably have included the veteran") (emphasis added) (internal quotation marks omitted).

While the Court notes that Department of Labor regulations appear to require of the defendant a lighter showing than some district court decisions have required, the Court need not resolve this issue here, because at the summary judgment stage, GM cannot meet its burden under either formulation of the standard. Whether the layoffs affecting the GM Wilmington plant "would have included" Vahey is essentially the same inquiry used to determine whether Vahey's "escalator position" was layoff status. Under either analysis, the Court is required to imagine a counterfactual scenario in which Vahey did not take military leave, and to determine whether GM would have laid him off anyway. Cf. Milhauser, 855 F. Supp. 2d at 903 (noting this redundancy in the statutory scheme, but finding it irrelevant where "the jury understood that at some point in the USERRA analysis it was to consider [the defendant's] economic problems and resulting reductions in force"). In light of the same factual disputes discussed above with respect to Vahey's escalator position, see supra, Section III.A.2, the Court cannot conclude that a jury would be unreasonable in finding against GM on its "changed circumstances" defense.

*       *       *

Having considered the facts in the light most favorable to Vahey, the Court finds that there is a genuine issue of material fact with respect to whether GM violated Vahey's rights under USERRA's reemployment provision, 38 U.S.C. § 4312(a). "A jury may resolve [the issue] in favor of the [defendant], but without improperly resolving disputed issues of fact, [the Court] cannot." Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999). Hence, the Court will deny GM's motion for summary judgment on Count 1.

## B. Count 2: Unlawful Discharge – 38 U.S.C. § 4316(c)

Vahey's second claim alleges unlawful discharge. After they are reemployed, returning servicemembers who spent more than 180 days in the military may not be fired "except for cause" within "one year after the date of such reemployment." 38 U.S.C. § 4316(c). The burden is on the employer to prove a "cause" defense. 20 C.F.R. § 1002.248. There is no dispute that, even if Vahey was properly reemployed, GM terminated his employment within one year of his return from military service.[8] Thus, to award summary judgment to GM on this claim, the Court must conclude that there is no genuine issue of material fact as to whether there was "cause" to fire Vahey. For many of the same reasons discussed above regarding Vahey's reemployment claim, the Court concludes that a reasonable jury could rule in favor of either party on this claim. Therefore, summary judgment is inappropriate.

"'Cause' as used in § 4316(c) is not defined by USERRA." Ferguson v. Walker, 397 F. Supp. 2d 964, 972 (C.D. Ill. 2005). Department of Labor regulations offer some additional clarity: "The employee may be discharged for cause based either on conduct, or, in some circumstances, because of the application of other legitimate nondiscriminatory reasons." 20 C.F.R. § 1002.248. GM does not argue that Vahey's conduct justified his termination, only that "the decision was based on legitimate, nondiscriminatory reasons." MSJ at 9. Courts have

---

[8] On GM's theory of the case, Vahey was terminated after two weeks. On Vahey's theory, he was terminated immediately, since he was "reemployed" into layoff status. The Court notes that neither the statutory scheme, nor the case law interpreting it, contains any indication of how to resolve an unlawful discharge claim for a returning servicemember who was never actually reemployed (or reemployed properly). On its face, 38 U.S.C. § 4316(c) only applies to "a person who is reemployed by an employer under this chapter," and the "for cause" protection only begins to run "after the date of such reemployment." See also Pl.'s Opp'n to MSJ at 21 ("As to the Defendant's defense that it had good cause for discharging the Plaintiff within his first year of reemployment, it is important to point out that the initial year of protection does not begin until the employee has been properly reemployed, which the Plaintiff contends did not occur . . . ."). But GM does not raise such an argument, and, in any event, the only question before the Court is whether GM is entitled to summary judgment on Vahey's unlawful discharge claim. GM is not, so the Court need not address this conundrum further now.

recognized that economic hardship leading to layoffs can qualify as such a legitimate reason. See, e.g., Duarte v. Agilent Techs., Inc., 366 F. Supp. 2d 1039, 1046 (D. Colo. 2005) ("[T]he discharge of reemployed military personnel due to the employer's adverse economic circumstances may be 'for cause.'"); Ferguson, 397 F. Supp. 2d at 972 ("[E]conomic conditions mandating a reduction in the number of employees may constitute cause for discharge under USERRA.").  But to successfully invoke this defense, GM "bears the burden of proving that the employee's job would have been eliminated or that he or she would have been laid off."  20 C.F.R. § 1002.248(b).  For that reason, "it is difficult for employers to achieve summary judgment on claims under § 4316(c)."  Francis v. Booz, Allen & Hamilton, Inc., 452 F.3d 299, 308 (4th Cir. 2006).

As an initial matter, GM argues that Vahey has conceded that his termination was "for cause," because his opposition brief "asserts that GM has the burden of proof to establish cause, but never establishes GM failed to meet any such burden."  Def.'s Reply in Supp. of MSJ at 2. To be sure, Vahey's opposition brief spends far more time discussing his reemployment and discrimination claims, and the one paragraph discussing the "cause" standard focuses on the burden of proof.  See Pl.'s Opp'n to MSJ at 21.  However, the Court does not agree that Vahey has conceded the argument.  Perhaps realizing that the "cause" analysis overlaps significantly with other important issues in this case—for example, determination of the proper escalator position, and the validity of GM's changed circumstances defense—Vahey may have felt it unnecessary to repeat overlapping arguments in multiple sections of his brief.  And it is due to this same substantial overlap that the Court chose to address GM's changed circumstances defense, despite it only appearing in one conclusory footnote.  See supra, Section III.A.3.  While Vahey's brief might have been organized differently, the Court will not treat this argument as

conceded, because the brief is full of discussion of the facts that are relevant to resolving the issue.

Applying the "cause" standard to Vahey's termination by GM, the Court returns to the question why Vahey was terminated (like most of his colleagues), rather than transferred to another GM facility (like some of his colleagues). Was it solely due to a neutral application of nondiscriminatory criteria? Or did Vahey's lengthy military absence hurt his chances? As discussed at length with respect to Count 1, this is a factual question that the Court is unable to resolve based on the sparse summary judgment record before it. Particularly in light of the complete lack of evidence in the record describing the process GM used to make this decision, and the email traffic placing heavy emphasis on the date of Vahey's return from his military absence (with no discussion of his qualifications for a transfer), a reasonable jury could rule in favor of either party on this claim. Therefore, the Court will deny GM's motion for summary judgment on Count 2.

## C. Count 3: Discrimination on the Basis of Military Service – 38 U.S.C. § 4311(a)

Vahey's third and final claim alleges that GM discriminated against him on the basis of his military absence in violation of 38 U.S.C. § 4311(a). USERRA prohibits an employer from denying "any benefit of employment . . . on the basis of" the plaintiff's military service. 38 U.S.C. § 4311(a). This claim rests on a slightly different set of facts than Counts 1 and 2: Vahey alleges that GM discriminated against him by not offering him an opportunity to apply for a transfer, even though "this opportunity was provided to non-USERRA protected employees." Compl. ¶ 44. Specifically, Vahey claims that every other employee at the GM Wilmington plant was given a choice before they were laid off: "either apply for a transfer or accept separation and severance." Watt Decl. ¶ 2. There is no dispute that Vahey was never offered such an

opportunity.   Vahey Decl. ¶¶ 20-21.   However, GM argues that there is a legitimate, nondiscriminatory explanation for this: <u>none</u> of the employees at the GM Wilmington plant were formally offered the opportunity to apply for a transfer before being laid off.   Def.'s Reply in Supp. of MSJ at 5 ("[S]alaried employees affected by the closure of the Wilmington plant did not have an 'opportunity' to apply for transfers as part of the closure process.").

While both parties take it for granted that a lost opportunity to apply for a transfer is a "benefit of employment" protected by USERRA, this appears to be a question of first impression. The statute defines "benefit of employment" broadly, to include "the terms, conditions, or privileges of employment, including any advantage, profit, privilege, gain, status, account, or interest (including wages or salary for work performed) that accrues," as well as "the opportunity to select work hours or location of employment."  38 U.S.C. § 4303(2).    And analogous cases from the Title VII and ADEA contexts also support the conclusion that the denial of an opportunity to apply for a promotion or a new position can be a "benefit of employment" protected under federal employment discrimination laws.   <u>See</u> <u>Douglas v. Donovan</u>, 559 F.3d 549, 552 (D.C. Cir. 2009) ("[I]f an employee is denied the opportunity to compete for a promotion, she has suffered an adverse employment action; we do not inquire whether she would have received the position but for the discrimination."); <u>Cones v. Shalala</u>, 199 F.3d 512, 521 (D.C. Cir. 2000) (accepting Title VII plaintiff's argument that "refusing to allow him to compete for the promotion was tantamount to refusing to promote him"); <u>Wilson v. Commc'ns Workers of Am.</u>, 767 F. Supp. 304, 307 (D.D.C. 1991) (allowing plaintiff to bring Title VII and ADEA discrimination claims because she "was not informed of the new supervisory position, although younger, white employees with similar skills and experience were afforded the opportunity to

apply for the promotion").  Thus, this Court agrees with the tacit assumption of the parties: the opportunity to apply for a transfer is a "benefit of employment" protected by USERRA.

The parties offer competing narratives regarding whether and how employees at the GM Wilmington plant were able to apply for transfers to another GM facility as their plant closed down.  Vahey explains his version of events as follows:

> Unlike the other salaried employees, General Motors never provided me with the opportunity to request or apply for consideration to other positions at GM that I was qualified for and to my knowledge I was never considered for any transfer opportunities.  I was told from the beginning, in May, 200[9],[9] that I would likely be severed and no other options were ever presented to me.

Vahey Decl. ¶ 21; see also Compl. ¶¶ 33-34.  Vahey maintains that while he was never offered an opportunity to apply for a transfer, the other salaried employees at the Wilmington plant did receive such an opportunity.  This assertion is corroborated by Jeffrey W. Watt, another former GM employee who worked at the Wilmington plant until August 20, 2009.  Watt explains:

> In early, June 2009, manager [sic] at the Wilmington plant called me and the other salaried employees into meetings in which we were offered two options, either apply for a transfer or accept separation and severance.  During my meeting with a GM manager, Mr. Darren Ford, I was informed that if I elected to apply for consideration for a transfer, I would need to fill out an application for review by HR management.  Mr. Ford specifically mentioned that there was an available Quality Engineer position in Lordstown, Ohio.

Watt Decl. ¶¶ 2-3.  Watt claims that "all salaried employees" received the same opportunity to apply for a transfer that he did.  Id. ¶ 6 ("While I was not present for other meetings between manager and the salaried employees, my understanding based upon conversations with others and my own meeting is that all salaried employees at the Wilmington plant were provided the same options . . . .").

---

[9] Vahey's declaration actually says "2005," but this appears to be a typographical error. See, e.g., Vahey Dep. at 87-89 (discussing a "visit to Paul Dobos on the fifth of May, 2009"); Ex. B to Pl.'s Opp'n to MSJ at D00300 (May 5, 2009 email from Paul Dobos to Theresa Fellows-Bechard discussing same meeting).

GM offers a simple defense to this claim. According to GM, both Vahey and Watt are simply mistaken. GM argues: "Mr. Watt's 'understanding' is incorrect. In fact, salaried employees affected by the closure of the Wilmington plant did not have an 'opportunity' to apply for transfers as a part of the closure process." Def.'s Reply in Supp. of MSJ at 5. As support for its version of events, GM offers the affidavit of Jeffrey Haladik, a human resources employee from GM's offices in Warren, Michigan:

> Transfer offers to salaried employees affected by the cessation of production operations at the Wilmington plant were made by GM to specific, individual employees based on a combination of factors, including current job classification, skills, and service date. Salaried employees affected by the cessation of production operations at the Wilmington plant did not have an opportunity to apply for transfers as a part of the plant closure process.

Second Haladik Aff. ¶ 5. GM also tries to discredit Watt's testimony, noting that Vahey's "only basis for [his] contention is the affidavit of a single co-worker who claims he has an 'understanding' of the experience and treatment of all salaried employees at Wilmington during the plant's closure . . . . Such blanket speculation is not evidence." Def.'s Reply in Supp. of MSJ at 5.

Perhaps GM is correct, and Watt's "understanding" is inaccurate. But resolving a credibility dispute between competing affiants is not an appropriate task for this Court when deciding a summary judgment motion. A reasonable jury would be entitled to credit Watt's testimony, rather than Haladik's (the inverse is obviously also true). Watt is a non-party to this proceeding who worked at the Wilmington plant during the relevant events, while Haladik is a current employee of the defendant who works in Michigan. Indeed, there is no indication where, if anywhere, Haladik worked for GM during the closure of the Wilmington plant, or any indication where he got his information—which tracks the language of GM's reply brief almost verbatim. Compare Second Haladik Aff. ¶ 5, with Def.'s Reply in Supp. of MSJ at 5. Under

these circumstances, GM's frustration that Vahey's strongest piece of evidence is "the affidavit of a single co-worker" rings hollow. While a jury could ultimately decide the issue in favor of GM, this Court may not do so at the summary judgment stage. See Arrington v. United States, 473 F.3d 329, 338 (D.C. Cir. 2006).

Concluding that a reasonable jury could find that Vahey was denied the opportunity to apply for a transfer does not end the inquiry. There must still be a genuine issue of material fact with respect to whether his "'service in the uniformed services' was a substantial or motivating factor in the adverse employment action." Potts v. Howard Univ. Hosp., 843 F. Supp. 2d 101, 104 (D.D.C. 2012) (quoting 38 U.S.C. § 4311(c)), aff'd, 493 F. App'x 114 (D.C. Cir. 2013). Here, there is.

Assuming that a jury believed Vahey's version of events, rather than GM's, then of the over one hundred salaried employees at the GM Wilmington plant, Vahey was the only one who was not offered a formal opportunity to apply for a transfer to another GM facility before being terminated. See Vahey Decl. ¶ 20; Watt Decl. ¶¶ 2-6. This is compelling circumstantial evidence that Vahey's military absence was a motivating factor in GM's denial of an opportunity to apply for a transfer. See Sheehan v. Dep't of Navy, 240 F.3d 1009, 1014 (Fed. Cir. 2001) ("Circumstantial evidence will often be a factor in [USERRA] cases, for discrimination is seldom open or notorious.").

Vahey also points to direct evidence. As discussed at length above, email traffic relating to Vahey's return to GM is full of references to his military absence, including calling his return date a "critical piece of information" in planning for upcoming layoffs. See supra, Section III.A.2. By contrast, there is no discussion of transfer opportunities, an application process (formal or informal), or possible openings that Vahey might be suited for at other GM facilities.

Again, a jury could look at this record and reasonably conclude that Vahey's military absence was at least partially responsible for any adverse treatment that he suffered.  See Erickson v. U.S. Postal Serv., 571 F.3d 1364, 1369 (Fed. Cir. 2009) (under USERRA, "discrimination in employment occurs when a person's military service is a motivating factor" in an adverse employment action, and it is not required "that military service be the sole motivating factor") (emphases added).  Thus, Vahey has made out a prima facie case of discrimination.

GM can still "avoid liability by demonstrating that it would have taken the same action anyway for a valid reason, without regard to the employee's military service."  Potts, 843 F. Supp. 2d at 104.  Once again, this analysis relies on the same facts analyzed above with respect to Vahey's prima facie case of discrimination, and the Court finds that there is a genuine dispute of material fact.  Because a reasonable jury could find for either party on this record, the Court will deny GM's motion for summary judgment on Count 3.

One additional item remains.  Although the Court has analyzed Vahey's discrimination claim as if he were challenging only GM's failure to give him an opportunity to apply for a transfer, at times Vahey appears to make broader claims: that GM's failure to properly reemploy him and GM's decision to terminate him are independent examples of discrimination in violation of Section 4311.  See generally Pl.'s Opp'n to MSJ at 21-30.  To the extent Vahey advances these arguments, they are duplicative of his reemployment and unlawful discharge claims.  If GM did not properly reemploy Vahey, then GM will be liable under USERRA's reemployment provision, see 38 U.S.C. § 4312(a), and if GM fired Vahey because of his military absence, GM will be liable under USERRA's unlawful discharge provision, for a lack of proper "cause" for termination, see id. § 4316(c).  Neither of those provisions requires a showing that the plaintiff's military service was a motivating factor in the employer's decision.  See, e.g., Coffman v.

Chugach Support Servs., Inc., 411 F.3d 1231, 1235 (11th Cir. 2005) ("Unlike section 4311, [section 4312] does not require an employee to show any discriminatory animus."); Burgener v. Union Pac. Corp., No. C 07-5160 JF (HRL), 2009 WL 1082356, at *10 n.14 (N.D. Cal. Apr. 22, 2009) (drawing same conclusion with respect to another sub-section of 38 U.S.C. § 4316). Thus, to the extent Vahey is pressing these broader claims as part of his discrimination claim, they will not have any bearing on his ultimate recovery (if any). See 38 U.S.C. § 4323(d) (generic remedies provision that allows recovery of damages for violations of "this chapter"). But in any event, for the reasons discussed above with respect to Vahey's other, better-developed arguments, summary judgment in favor of GM is not warranted on this record, for any of his claims.

## CONCLUSION

The Court finds that, on the record before it, a reasonable jury could resolve each of Vahey's three claims in favor of either party. Therefore, the Court will deny GM's motion for summary judgment in its entirety. A separate order accompanies this memorandum opinion.


_____
/s/
JOHN D. BATES
United States District Judge


Dated: October 23, 2013